IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


UNITED STATES OF AMERICA,

      Plaintiff,


v.                                                 No. 2:15-cr-3648 RB


AMADO ACEVEDO-GONZALEZ and
YOLANDA RODRIGUEZ,

      Defendants.


## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Yolanda Rodriguez's Motion for *James* Hearing[1] to Determine Admissibility of Co-Conspirators' Statements, filed on August 8, 2016. (Doc. 230.) Defendant Amado Acevedo-Gonzalez has joined in this motion. (Docs. 231, 258.) The Court held a *James* hearing on September 19, 2016. Having considered the submissions of counsel and relevant law, the Court finds that the statements identified in Government's Exhibit 1 at the *James* hearing are admissible.

**I.    Background**

The Indictment charges 20 Defendants with 45 counts including conspiracy; money laundering; distribution of cocaine; possession with intent to distribute cocaine, marijuana, and heroin; use of a communication facility to further the commission of a drug trafficking crime; and reentry of removed aliens. (Doc. 19.) Eight Defendants are fugitives and ten Defendants

---

[1] *See United States v. James*, 590 F.2d 575 (5th Cir.), *cert. denied*, 442 U.S. 917 (1979).

have pleaded guilty. Defendant Acevedo-Gonzalez and Defendant Rodriguez (hereinafter "Defendants") are set for trial beginning on October 3, 2016.

Specifically as to Defendant Rodriguez, the Indictment charges three counts: Count 1, conspiracy to distribute 5 kilograms and more of cocaine, contrary to 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), 100 kilograms and more of a mixture and substance containing a detectable amount of marijuana, contrary to 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), and 100 grams and more of a mixture and substance containing a detectable amount of heroin, contrary to 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), in violation of 21 U.S.C. § 846; Count 2, conspiracy to commit international money laundering, in violation of 18 U.S.C. § 1956(h); and Count 30, transporting U.S. currency out of the United States to promote distribution of a controlled substance, in violation of 18 U.S.C. § 1956(a)(2), and aiding and abetting, in violation of 18 U.S.C. § 2. (Doc. 19.) With regard to the conspiracy, the Indictment alleges that Defendant Rodriguez committed Overt Acts 23, 81, 82, and 83, which involve the transport of cocaine on February 4, 2015 and the transport of drug proceeds on July 4, 2015. (*Id.*)

Specifically as to Defendant Acevedo-Gonzalez, the Indictment charges three counts: Count 1, conspiracy to distribute 5 kilograms and more of cocaine, contrary to 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), 100 kilograms and more of a mixture and substance containing a detectable amount of marijuana, contrary to 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), and 100 grams and more of a mixture and substance containing a detectable amount of heroin, contrary to 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), in violation of 21 U.S.C. § 846; Count 28, possession with intent to distribute over 100 kilograms of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D), and aiding and abetting, in violation of 18 U.S.C. § 2; and Count 29, use of a communication facility to further a drug trafficking crime, in violation of 21 U.S.C. § 843(b).

(Doc. 19.) With regard to the conspiracy, the Indictment alleges that Defendant Acevedo-Gonzalez committed Overt Acts 77 and 78, which involve telephone calls concerning the distribution of marijuana on July 4, 2015. (*Id.*)

Defendants requested a *James* hearing to determine the admissibility of statements under Rule 801(d)(2)(E) of the Federal Rules of Evidence. *See United States v. James*, 590 F.2d 575 (5th Cir.), *cert. denied,* 442 U.S. 917 (1979). The Court held a *James* hearing on September 19, 2016, and heard the testimony of DEA Agent Shea Shurley. At the hearing, the United States presented a chart of the statements at issue as Government Exhibit 1.

## II.     Standard

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides that "[a] statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). Before admitting co-conspirator statements under Rule 801(d)(2)(E), the Court must determine by a preponderance of the evidence that (1) a conspiracy existed, (2) the defendant and the declarant were members of the conspiracy, and (3) the declarant made the statements during the course of and in furtherance of the conspiracy. *See United States v. Thornburgh*, 645 F.3d 1197, 1210 (10th Cir. 2011); *United States v. Urena*, 27 F.3d 1487, 1490 (10th Cir. 1994). The Government bears the burden of demonstrating each of the three elements by a preponderance of the evidence. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Perez*, 989 F.2d 1574, 1577 (10th Cir. 1993).

In order to make these factual determinations, the district court may hold a pretrial *James*" hearing or provisionally admit the statements on the condition that the prosecution "connect up" the evidence and prove the existence of the predicate conspiracy through trial

testimony or other evidence. *United States v. Owens*, 70 F.3d 1118, 1123 (10th Cir. 1995). The Tenth Circuit has strongly recommended that, before admitting statements of co-conspirators under Rule 801(d)(2)(E), a district court should hold a pretrial hearing to determine whether the alleged conspiracy existed. *See id.; United States v. Townley*, 472 F.3d 1267, 1273 (10th Cir. 2007). Because the admissibility of the statements is a preliminary determination governed by Rule 104(a) of the Federal Rules of Evidence, "the district court has the discretion to consider any evidence not subject to a privilege, including both the coconspirator statements the government seeks to introduce at trial and any other hearsay evidence, whether or not that evidence would be admissible at trial." *Owens*, 70 F.3d at 1124.

### III.   Summary of Evidence

At the *James* hearing, Agent Shurley testified that the investigation commenced in October 2014, when an undercover FBI agent arranged to purchase ten kilograms of cocaine. Agents seized five kilograms of cocaine and learned that the source of the cocaine was Ignacio Villalobos, a notorious drug trafficker.

Mr. Villalobos is responsible for most of the narcotics imported into the United States through the area of Palomas, Chihuahua, Mexico. Mr. Villalobos resides in Mexico and he is a fugitive from justice in the United States. Mr. Villalobos is a member of La Linea, a drug cartel based in Ciudad Juarez that controls the northwest Chihuahua area. During the relevant time period, Arturo Vasquez-Barragan was in charge of La Linea. Mr. Vasquez-Barragan would give orders to Edgar Estopellan, who in turn would direct Mr. Villalobos. Mr. Vasquez-Barragan, Mr. Estopellan, and Mr. Villalobos operated the cartel from Mexico. Mr. Villalobos's arm of the cartel specialized in transporting cocaine and marijuana from Mexico to Albuquerque, New Mexico, distributing the drugs, and transporting the cash proceeds back to Mexico.

Mr. Villalobos and the members of his organization use BlackBerry Messenger as a primary means of communication. BlackBerry Messenger is an internet-based application that allows for instant messaging. The server for BlackBerry Messenger is located in the United States and all messages are routed through that server. From January through August 2015, agents received court authorization to intercept messages and phone calls from 13 communications devices used by members of the organization in both the United States and Mexico.

Through the intercepted communications, agents learned that Mr. Villalobos's organization transported the drugs across the border by backpackers or in false compartments built into various types of vehicles, including tractor-trailer rigs, cars, and pickup trucks. Once inside the United States, the marijuana and cocaine were transported by vehicle to an auto body shop in Albuquerque operated by Jesus Muñoz, a member of the cartel. Mr. Muñoz would unload the shipments and coordinate with Mr. Villalobos or Mr. Estopellan to distribute the drugs. Mr. Muñoz was responsible for collecting the money from the drugs sales and sending the money back to Mr. Estopellan. Typically, Mr. Muñoz would arrange for the money to be transported back to Mexico wrapped in black electrical tape and concealed in vehicles.

Government's Exhibit 1 is a chart showing communications intercepted between February 3, 2015 and August 12, 2015. (Govt. Ex. 1.) These intercepted messages establish that Defendant Rodriguez's role in the organization was to transport cocaine from Palomas to Albuquerque and to transport drug proceeds from Albuquerque to Palomas. The messages also establish that Mr. Acevedo-Gonzalez had prior dealings with the organization and his role was to facilitate the distribution of marijuana.

On February 3–5, 2015, Mr. Villalobos communicated with Mr. Estopellan, Mr. Muñoz, and Jesus Prieto-Trevizo about distributing kilograms of cocaine and collecting proceeds of the sales. On February 3, 2015, Mr. Villalobos informed Mr. Muñoz that the organization was sending a courier to pick up the drug proceeds. Mr. Villalobos instructed Mr. Muñoz to divide the cash in two packages. Agent Shurley testified that this meant that Mr. Villalobos wanted the proceeds sent back in two vehicles in case one got caught.

On February 5, 2015, communications between Mr. Muñoz and Mr. Villalobos indicated that half the money would be packed in 11 bundles and sent south with a courier named Tomas. Agents obtained the phone number for Tomas and tracked the phone with GPS. After tracking Tomas and the truck to Las Cruces, New Mexico, agents arranged for a traffic stop. As a result of the traffic stop, agents found 11 bundles of cash in the total amount of $174,290 hidden near the radiator of the truck.

On February 4, 2015, Mr. Villalobos and Mr. Prieto-Trevizo communicated about arranging to send another courier to Albuquerque to pick up the other portion of the drug proceeds. Mr. Prieto-Trevizo had been talking with "the lady" who was asking when there would be opportunities to smuggle cocaine. Mr. Villalobos inquired whether it would be possible to make a stash compartment in her vehicle and requested a photograph of her car battery.

Mr. Villalobos inquired about the identity of "the lady" and Mr. Prieto-Trevizo described her as "Yolanda that has La Hacienda Hotel." Mr. Villalobos asked if she was "Yolanda, the lesbian." Mr. Prieto-Trevizo responded, "Yes, that's the one." Mr. Prieto-Trevizo indicated that Yolanda had worked for the organization before by transporting money.

Subsequent to intercepting these communications, agents learned that Defendant Yolanda Rodriguez ran La Hacienda Hotel in Palomas and everyone in Palomas was aware that she was a

lesbian. Mr. Villalobos told Mr. Prieto-Trevizo that he would get approval from Mr. Vasquez-Barragan to allow the cartel to use Yolanda to transport cocaine and drug proceeds. Mr. Villalobos asked Mr. Prieto-Trevizo to determine whether Yolanda had any acquaintances who would want to work for the cartel.

On February 7, 2015, Mr. Estopellan communicated with Mr. Villalobos and confirmed that Mr. Vazquez-Barragan had approved Yolanda to work for the cartel as a courier.

On February 15, 2015, Mr. Villalobos and Rene Amaya communicated about two different loads of drug proceeds: one of $30,000; and one of approximately $14,000. During the communications, Mr. Villalobos stated that "yolanda" brought down a load of money.

In April 2015, Mr. Muñoz communicated with an Unknown Male 317 (UM 317) about a load that was on the way to Albuquerque and about when Mr. Muñoz could expect the arrival of the truck. Mr. Muñoz also communicated with his assistant, Elier Jaime-Castillo, about a trailer load that had been left at the shop.

On April 12, 2015, Mr. Muñoz and Mr. Villalobos communicated about having the money picked up from Mr. Muñoz and transported back to Mexico. During the communication, they mentioned a phone number of a courier. Agents determined that the phone number was linked to Emilia Quezada. In May 2015, agents intercepted Ms. Quezada with a load of money.

On May 20, 2015, UM 317 and Mr. Muñoz communicated about a trailer en route to Albuquerque with another load of narcotics. On May 20-21, 2015, Mr. Muñoz communicated with Unknown Male 153 (UM 153) about distribution of marijuana and cocaine. Mr. Muñoz communicated with UM 317 about unloading 180 pounds of marijuana.

On May 25, 2015, Mr. Muñoz coordinated with Mr. Estopellan about transporting proceeds from the sale of pounds of marijuana to Mexico. Mr. Estopellan confirmed that Mr.

Muñoz should deduct from the proceeds $2,150 for rent and $1,800 for his fees. Mr. Estopellan provided Mr. Muñoz with the phone number of Ms. Quezada, who was coming to pick up the money. Agents set up surveillance and stopped Ms. Quezada southbound on Interstate 25 and found approximately $52,000 in her vehicle.

On July 2, 2015, Mr. Muñoz received a load of marijuana from UM 317 in a trailer. Mr. Muñoz and Mr. Estopellan communicated about how to distribute the marijuana. Mr. Muñoz was in talks with UM 153 about whether he was interested in taking any of this shipment of marijuana or if UM 153 had any other buyers that were interested. UM 153 was not able to buy from this shipment.

On July 3, 2015, Mr. Muñoz communicated with UM 153 and an individual named Oso about distributing the marijuana. Mr. Muñoz told Mr. Estopellan that he had 171 pounds of marijuana and he was looking for buyers to come purchase the marijuana from him. Mr. Estopellan stated "let me coordinate" meaning that he would look for buyers.

On July 4, 2015, Defendant Acevedo-Gonzalez called Mr. Muñoz and indicated that Mr. Estopellan suggested that Mr. Muñoz had marijuana. Mr. Muñoz asked if Defendant Acevedo-Gonzalez was going to bring him something and Defendant Acevedo-Gonzalez said he was going to take Mr. Muñoz some paper. Agent Shurley testified that paper is code for money. Defendant Acevedo-Gonzalez asked if it was the same place and Mr. Muñoz said that it was. Defendant Acevedo-Gonzalez said that he was going to send his cousin "the one from the other time." These statements indicate that this was not the first time that Defendant Acevedo-Gonzalez purchased marijuana from the organization.

Mr. Muñoz communicated with Unknown Male 291 (UM 291), who told Mr. Muñoz that "Amado" had told him to pick up something from Mr. Muñoz. Mr. Muñoz gave UM 291

directions to the shop to pick up the marijuana. On the afternoon of July 4, 2015, agents observed Mr. Muñoz loading boxes into a white Jeep and a black car.

Agents obtained GPS information from Defendant Acevedo-Gonzalez's phone and identified residences in Belen, New Mexico as well as the Costco parking lot in Albuquerque as probable locations to find him. In the Costco parking lot, agents observed a truck with a license plate registered to Defendant Amado Acevedo-Gonzalez. Shortly thereafter, agents saw Defendant Acevedo-Gonzalez get into the truck with his family.

On July 4, 2015, Mr. Muñoz texted with Mr. Estopellan and confirmed that the buyer picked up the marijuana and paid $15,000 for it. Mr. Estopellan instructed Mr. Muñoz to deduct his fee and that Mr. Estopellan would send a courier for the balance of the $15,000. Mr. Estopellan texted Mr. Muñoz a phone number and the name Yolanda. Mr. Estopellan instructed Mr. Muñoz to "call her in 15 minutes so you can give her that." Agent Shurley testified that this meant that Mr. Estopellan wanted Mr. Muñoz to arrange to give the money to Yolanda.

Mr. Muñoz sent Mr. Jaime-Castillo to meet with Yolanda and provided her phone number to Mr. Jaime-Castillo so that they could coordinate Mr. Jaime-Castillo delivering the money to Yolanda. Mr. Muñoz, Mr. Jaime-Castillo, and Mr. Estopellan communicated about how to reimburse Yolanda for expenses for the trip to Albuquerque. Ultimately, Mr. Estopellan instructed them to give Yolanda $200 out of the drug proceeds that she was transporting. Subsequently, Mr. Jaime-Castillo told Mr. Muñoz that "it's done."

Agents entered the phone number for Yolanda into Facebook and it hit on Defendant Yolanda Rodriguez's Facebook page. Agents confirmed that some of the photographs on the Facebook page depicted Defendant Rodriguez. Additionally, agents obtained records showing

that Defendant Rodriguez had crossed the international border from Palomas into Columbus, New Mexico about two or three hours before the calls were intercepted.

On July 5, 2015, Mr. Muñoz communicated with Fabian Gomez about the transaction from the previous day. Agents had previously identified Mr. Gomez through phone pings and locations from Defendant Acevedo-Gonzalez's phone. Based on the investigation, it appeared that Mr. Gomez was receiving narcotics from the drug trafficking organization and that Mr. Gomez worked in conjunction with Defendant Acevedo-Gonzalez about receiving the marijuana on July 4, 2015. Agents obtained phone records confirming that Mr. Gomez had communicated with Mr. Jaime-Castillo on July 4, 2015.

On August 12, 2015, UM 317 communicated with Mr. Muñoz about a trailer bound for Mr. Muñoz's shop in Albuquerque. The trailer was stopped at the immigration checkpoint on Interstate 25. A search revealed that the trailer contained approximately 177 pounds of marijuana. Intercepted communications indicate that Mr. Muñoz and UM 317 were aware that the trailer was stopped at the checkpoint and that the marijuana was seized.

On the same day, agents intercepted a load of approximately $40,000 that was being transported from Albuquerque to Mexico by a courier. Because the marijuana and the money was seized on the same day, members of the organization discontinued the use of their phones and fled to Mexico. Mr. Muñoz became a fugitive in Mexico.

On August 13, 2015 agents executed a search warrant for a known stash house used by the organization and seized marijuana and heroin. Agents observed a vehicle leave the stash house and followed the vehicle to a Wal-Mart parking lot. The driver abandoned the vehicle and a search revealed that it contained approximately 50 pounds of marijuana. The driver was identified as Mr. Jaime-Castillo.

Investigations revealed that the phones used by Defendant Rodriguez and Defendant Acevedo-Gonzalez contained the phone numbers of co-conspirators.

## IV. Discussion

In order to admit evidence under Rule 801(d)(2)(E), the Court must determine by a preponderance of the evidence that (1) the conspiracy existed, (2) the declarant and the defendant were members of the conspiracy, and (3) the statements were made in the course of and in furtherance of the conspiracy. *United States v. Patterson*, 713 F.3d 1237, 1245 (10th Cir. 2013). To establish the existence of a conspiracy, the Government must show that (1) two or more persons agreed to violate the law, (2) the defendant knew the essential objectives of the conspiracy, (3) the defendant knowingly and voluntarily participated in the conspiracy, and (4) the alleged coconspirators were interdependent. *United States v. Small*, 423 F.3d 1164, 1182 (10th Cir. 2005). To prove knowledge of the essential objectives of a conspiracy, the government does not have to show the defendant knew all the details or all the members of a conspiracy. *Id.* "Rather, the government only needs to demonstrate the defendant shared a common purpose or design with his alleged coconspirators." *United States v. Yehling*, 456 F.3d 1236, 1240 (10th Cir. 2006).

When making its factual determination as to whether a conspiracy exists, the Court may consider the proffered statements, along with independent evidence tending to establish the conspiracy. *See United States v. Lopez-Gutierrez*, 83 F.3d 1235, 1242 (10th Cir. 1996) (holding that the Court may consider co-conspirator statements in determining existence of conspiracy) (citing *Bourjaily v. United States*, 483 U.S. 171 (1987)). It bears underscoring that, the Government is not limited to "direct proof of an express agreement on the part of the defendant.

Instead the agreement may be informal and may be inferred entirely from circumstantial evidence." *United States v. Pulido-Jacobo*, 377 F.3d 1124, 1129 (10th Cir. 2004).

The focal point for determining whether a conspiracy existed is the concept of interdependence. *United States v. Caldwell*, 589 F.3d 1323, 1329 (10th Cir. 2009). "Interdependence exists where co-conspirators 'inten[d] to act together for their shared mutual benefit within the scope of the conspiracy charged.' " *Id.* (quoting *United States v. Evans*, 970 F.2d 663, 671 (10th Cir. 1992)). This requires that "each [coconspirator's] activities 'constituted essential and integral steps toward the realization of a common, illicit goal.'" *United States v. Edwards*, 69 F.3d 419, 431 (10th Cir. 1995) (quoting *United States v. Fox*, 902 F.2d 1508, 1514 (10th Cir. 1990)). Interdependence is often proved by circumstantial evidence, *United States v. Hutchinson*, 573 F.3d 1011, 1035 (10th Cir. 2009), and it does not require proof that the conspirators know the identities or details of each scheme or have connections with all other members of the conspiracy, *United States v. Foy*, 641 F.3d 455, 465 (10th Cir. 2011) (reviewing a sufficiency challenge for plain error). In this case, the Government presented sufficient evidence to establish the existence of a conspiracy to transport and distribute cocaine and marijuana and transport the proceeds from the sales to Mexico.

Defendants contend that they were not members of the conspiracy. The Tenth Circuit has held that *Bourjaily* requires "at most, there . . . be some independent evidence linking the defendant to the conspiracy." *United States v. Martinez*, 825 F.2d 1451, 1453 (10th Cir. 1987). Independent evidence need not be substantial to be found sufficient. *United States v. Rascon*, 8 F.3d 1537, 1541 (10th Cir. 1993). Generally there must be some evidence other than the proffered statements themselves, but the required level of independent evidence is low. *See United States v. Lopez–Gutierrez*, 83 F.3d 1235, 1242 (10th Cir. 1996) ("In making its

preliminary factual determination as to whether a conspiracy exists, the court may consider the hearsay statement sought to be admitted, along with the independent evidence tending to establish the conspiracy."). Notably, a co-conspirator's direct observations and contact with the defendant qualify as independent evidence of a conspiracy. *United States v. Hernandez*, 829 F.2d 988, 995 (10th Cir. 1987).

In this case, the intercepted communications are sufficient to show the existence of a tacit, mutual understanding between both Defendants and the other members of the conspiracy. *See United States v. Sells*, 477 F.3d 1226, 1236 (10th Cir. 2007) (inferring an agreement based on frequent contacts among the defendants and joint actions). Additionally, the communications were made in furtherance of the conspiracy because they were "intended to promote the conspiratorial objectives." *United States v. Townley*, 472 F.3d at 1273 (internal quotation omitted).

The Government has presented evidence that satisfies its burden with respect to Defendant Yolanda Rodriguez. More specifically, Mr. Villalobos inquired about the identity of "the lady" and Mr. Prieto-Trevizo described her as a "Yolanda that has La Hacienda Hotel." Mr. Villalobos asked if she was "Yolanda, the lesbian." Mr. Prieto-Trevizo responded, "Yes, that's the one." Subsequent to intercepting these communications, agents learned that Defendant Yolanda Rodriguez ran La Hacienda Hotel in Palomas and everyone in Palomas was aware that she was a lesbian.

Mr. Estopellan texted Mr. Muñoz a phone number and the name Yolanda. Agents entered the phone number for Yolanda into Facebook and it hit on Defendant Yolanda Rodriguez's Facebook page. Agents confirmed that some of the photographs on the Facebook page depicted Defendant Rodriguez. Additionally, agents obtained records showing that Defendant Rodriguez

had crossed the international border from Palomas into Columbus, New Mexico about two or three hours before the calls were intercepted. The phone used by Defendant Rodriguez contained the phone numbers of co-conspirators.

Similarly, the Government has met its burden with respect to Defendant Amado Acevedo-Gonzalez. After Mr. Muñoz told Mr. Estopellan that he had 171 pounds of marijuana and he was looking for buyers Mr. Estopellan stated "let me coordinate" meaning that he would look for buyers. The next day, on July 4, 2015, Defendant Acevedo-Gonzalez called Mr. Muñoz and indicated that Mr. Estopellan suggested that Mr. Muñoz had marijuana. Mr. Muñoz asked if Defendant Acevedo-Gonzalez was going to bring him something and Defendant Acevedo-Gonzalez said he was going to take Mr. Muñoz some money.

Defendant Acevedo-Gonzalez asked if it was the same place and Mr. Muñoz said that it was. Defendant Acevedo-Gonzalez said that he was going to send his cousin "the one from the other time." These statements suggest Defendant Acevedo-Gonzalez had purchased marijuana from the organization on prior occasions. Mr. Muñoz communicated with UM 291, who told Mr. Muñoz that "Amado" had told him to pick up something from Mr. Muñoz. Mr. Muñoz gave UM 291 directions to the shop to pick up the marijuana. That afternoon, agents observed Mr. Muñoz loading boxes into a white Jeep and a black car. On July 4, 2015, Mr. Muñoz texted with Mr. Estopellan and confirmed that the buyer picked up the marijuana and paid $15,000 for it. On July 5, 2015, Mr. Muñoz communicated with Mr. Gomez about the transaction from the previous day. Agents had previously identified Mr. Gomez through phone pings and locations from Defendant Acevedo-Gonzalez's phone. Based on the investigation, it appeared that Mr. Gomez was receiving narcotics from the drug trafficking organization and that Mr. Gomez worked in conjunction with Defendant Acevedo-Gonzalez about receiving the marijuana on July 4, 2015.

Agents obtained phone records confirming that Mr. Gomez had communicated with Mr. Jaime-Castillo on July 4, 2015. The phone used by Defendant Acevedo-Gonzalez contained the phone numbers of co-conspirators.

In this case, the Government has established by a preponderance of the evidence that the conspiracy existed, the declarants and Defendants were members of the conspiracy, and the statements were made in the course of and in furtherance of the conspiracy. Notably, the members of the conspiracy worked together to transport controlled substances, distribute controlled substances, and transport the proceeds of the sales of controlled substances to Mexico. The co-conspirators and Defendants worked for the good of the overall organization. The evidence presented at the *James* hearing shows by a preponderance of the evidence that Defendants and the declarants shared the same criminal objectives.

V.   **Conclusion**

The statements summarized in Government's Exhibit 1 are admissible at trial under Rule 801(d)(2)(E).

**THEREFORE,**

**IT IS ORDERED** that the Defendants' Motion for *James* Hearing to Determine Admissibility of Co-Conspirators' Statements, filed on August 8, 2016, (Doc. 230), is **GRANTED as to the request for the *James* hearing and DENIED as to the request to exclude the statements.**

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**